UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HARRY CURTIS, individually and on behalf of all others similarly situated, | § § § § § | Civil Action No. 4:19-cv-2147 |
| Plaintiff, | § § | JURY DEMAND |
| v. | § § | |
| BUCKEYE PARTNERS, L.P., OLIVER G. RICHARD III, CLARK C. SMITH, FRANK S. SOWINSKI, BARBARA J. DUGANIER, JOSEPH A. LASCALA, JR., LARRY C. PAYNE, MARTIN A. WHITE, PIETER BAKKER, BARBARA M. BAUMANN, MARK C. MCKINLEY, and BUCKEYE GP, LLC, | § § § § § § § § § | |
| Defendants. | § § | |

## CLASS ACTION COMPLAINT

Plaintiff Harry Curtis ("Plaintiff"), alleges upon personal knowledge as to his own acts and upon information and belief as to all other matters, based upon the investigation made by and through his attorneys, which investigation included, *inter alia*, the review of United States Securities and Exchange Commission ("SEC") filings, press releases, analyst reports, news articles and other materials, as follows:

## I.    NATURE OF THE CASE

1.    Plaintiff brings this class action individually and on behalf of all other similarly situated unitholders of Buckeye Partners, L.P. ("Buckeye Partners" or the "Partnership") against Buckeye Partners, its general partner, Buckeye GP, LLC ("Buckeye GP"), and Buckeye GP's Board of Directors (the "Board" or the "Individual Defendants," identified below), in connection with their attempt to sell the Partnership to IFM Global Infrastructure Fund, a wholly owned

subsidiary of IFM Investors, collectively ("IFM") by means of an unfair process and for an unfair price. Plaintiff also brings claims against Defendants (defined herein) for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder ("Rule 14a-9").

2.     On May 10, 2014, IFM and the Partnership announced that they had entered into an Agreement and Plan of Merger (the "Merger Agreement") that will culminate in IFM, through an affiliated entity, acquiring all of the outstanding units of Buckeye Partners in an all-cash transaction valued at approximately $10.3 billion including assumed debt). Buckeye Partners unitholders are expected to receive $41.50 for each unit of Buckeye Partners they own (the "Merger").

3.     Thereafter, on June 7, 2019, Buckeye Partners filed a Preliminary Proxy Statement on form PREM14A (the "Preliminary Proxy") with the SEC in support of the Proposed Transaction.

4.     The Board has violated Buckeye Partners' partnership agreement ("LPA," as further described below) and breached their express and implied contractual duties owed and fiduciary duties to Plaintiff and other Buckeye Partners unitholders by agreeing to the Merger for grossly inadequate consideration. As described in more detail below, given Buckeye Partners' recent strong performance as well as its future growth prospects, the consideration that unitholders will receive is inadequate and undervalues the Partnership.

5.     In addition, the Proposed Transaction is unfair and undervalued for a number of reasons. Significantly, the Preliminary Proxy describes an insufficient sales process in which the Board rushed through an inadequate "sales process" in which the only end goal was a sale to IFM, and in which only a cursory market check was conducted.

6.      Moreover, no committee of disinterested directors was created to run the process.

7.      Further evidence of the conflicted nature of the sales process is the fact that Buckeye Partners unnecessarily retained two financial advisors in regards to the sales process, Intrepid Partners, LLC ("Intrepid") and Wells Fargo Securities, LLC ("Wells Fargo").  This unnecessary waste of Buckeye Partners' capital was highlighted by the fact that no fairness opinion from Intrepid regarding the Proposed Transaction was included in the Preliminary Proxy.

8.      Such a sales process, or lack thereof, clearly indicates that the only end-goal acceptable to Defendants was an acquisition of Buckeye Partners by IFM.

9.      The Individual Defendants, as defined herein, have exacerbated their breaches of fiduciary duty by agreeing to lock up the Merger with preclusive and onerous deal protection devices that preclude other bidders from making successful competing offers for the Partnership and act to render the Merger a *fait accompli*.  For example, the Board agreed to: (i) a "no shop" provision that prevents the Partnership from negotiating with or providing confidential information to competing bidders except under extremely limited circumstances; (ii) a "matching rights" provision that allows IFM to match any competing proposal in the unlikely event that one emerges; and (iii) a $130 million termination fee if the Board agrees to a competing proposal. These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives to the Merger.

10.      Furthermore, in violation of Sections 14(a) and 20(a) of the Exchange Act, and in in further violation of their fiduciary duties, Defendants caused to be filed the materially deficient Preliminary Proxy on June 7, 2019, with the SEC in an effort to solicit unitholders to vote their Buckeye Partners units in favor of the Proposed Transaction.  The Preliminary Proxy is

materially deficient, deprives Buckeye Partners unitholders of the information they need to make an intelligent, informed and rational decision of whether to vote their units in favor of the Proposed Transaction, and is thus in breach of Defendants' fiduciary duties.  As detailed below, the Preliminary Proxy omits and/or misrepresents material information concerning, among other things: (a) the sales process; (b) the financial projections for Buckeye Partners, provided by Buckeye Partners to the Partnership's financial advisors Intrepid and Wells Fargo for use in their financial analyses; and (c) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinions provided by the Partnership's financial advisors, Intrepid and Wells Fargo.

11.    Consequently, the Individual Defendants have breached their fiduciary duties of loyalty and due care, and IFM has aided and abetted such breaches by Buckeye Partners' officers and directors.

12.    For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Merger, or in the event the Merger is consummated, recover damages resulting from the Individual Defendants' violations of their fiduciary duties of loyalty, good faith, due care, and full and fair disclosure.

## II.    JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.  The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

14.    The Court has personal jurisdiction over each Defendant because each either is organized under the laws of, conducts business in and maintains operations in this District, or is

an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (a) one or more Defendant either resides in or maintains executive offices here; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

III.    **PARTIES**

16. Plaintiff is, and has been at all relevant times, the owner of common units of Buckeye Partners.

17. Defendant Clark C. Smith ("Smith") has been the Chairman, President and Chief Executive Officer ("CEO") of Buckeye GP since 2014.

18. Defendant Pieter Bakker ("Bakker") has been a director of Buckeye GP since 2011.

19. Defendant Barbara M. Baumann ("Baumann") has been a director of Buckeye GP since 2011.

20. Defendant Barbara J. Duganier ("Duganier") has been a director of Buckeye GP since 2013.

21. Defendant Joseph A. LaScala, Jr. ("LaScala") has been a director of Buckeye GP since 2010.

22.    Defendant Mark C. McKinley ("McKinley") has been a director of Buckeye GP since 2007.

23.    Defendant Larry C. Payne ("Payne") has been a director of Buckeye GP since 2014.

24.    Defendant Oliver G. Richard III ("Richard") has served as a Director of Buckeye GP since 2009.

25.    Defendant Frank S. Sowinski ("Sowinski") has served as a Director of Buckeye GP since 2006 and is the Lead Independent Director.

26.    Defendant Martin A. White ("White") has served as a Director of Buckeye GP since 2010.

27.    Defendant Buckeye Partners is a limited partnership organized and existing under the laws of the State of Delaware.  It maintains its principal executive offices at One Greenway Plaza, Suite 600, Houston, Texas, 77046.  Its common units are listed on the New York Stock Exchange under the symbol "BPL."

28.    Defendant Buckeye GP is the general partner of the Partnership.  Importantly, as is common among publicly traded limited partnerships, the Partnership is managed by Buckeye GP's directors and officers.  Buckeye GP is a Delaware limited liability company.

29.    Non-Defendant IFM is an investment fund manager.  IFM's principal executive offices are located at Level 29 Casselden 2 Lonsdale Stree,t Melbourne VIC 3000 Australia.

30.    Defendants set forth in paragraphs 17 to 26 are referred to herein as the "Board" or the "Individual Defendants."

31.    Defendants set forth in paragraphs 17 to 28 are referred to herein as "Defendants."

IV.    **CLASS ACTION ALLEGATIONS**

32.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons that own Buckeye Partners common units (the "Class") as of May 10, 2019, the date on which the Merger was announced.  Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

33.    The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  All members of the Class may be identified from records maintained by Buckeye Partners or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

34.    Questions of law and fact are common to the Class, including:

(i)    Have the Individual Defendants breached their obligations to act in good faith and/or fiduciary duties of undivided loyalty or due care with respect to Plaintiff and the other members of the Class in connection with the Merger;

(ii)    Have the Individual Defendants breached or violated any of the terms and conditions of the LPA in connection with the Merger;

(iii)    Have Defendants violated the implied covenant of good faith and fair dealing by entering into the Merger Agreement;

(iii)    Have the Individual Defendants breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Merger;

(iv)     Have the Individual Defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Partnership or its assets;

(v)     Whether Defendants failed to provide Plaintiff and the other members of the Class with true, full and fair disclosure of all material information in connection with the Merger;

(vi)     Whether the Preliminary Proxy contains material misrepresentations and/or omissions in violation of federal laws;

(vii)     Whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated; and

(viii)     Is the Class entitled to injunctive relief or damages as a result of Defendants' wrongful conduct.

35.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages as a result of Defendants' wrongful conduct as alleged herein.

36.     Plaintiff will fairly and adequately protect the interests of the Class, and have no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

37.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class, and conflicting adjudications for individual members of the Class might, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.  Moreover, Defendants have acted or

refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

38.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## V.    OBLIGATIONS & FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

39.    By reason of the Individual Defendants' positions with the Partnership as officers and/or directors of Buckeye GP, said individuals are in a fiduciary relationship with Plaintiff and the other unitholders of Buckeye Partners and owe Plaintiff and the other members of the Class, as well as the Partnership, at a minimum an implied contractual duty of good faith and fair dealing.

40.    The relationship between Buckeye GP's Board and its public unitholders is, in part, governed by the LPA – i.e., the Amended and Restated Agreement of Limited Partnership of Buckeye Partners, LP dated November 19, 2010.

41.    Section 8.1 of the LPA states: "The Limited Partners shall have no liability under this Agreement (including, without limitation, liability under Section 7.12)."

42.    Under the Delaware Act, partnership agreements in Delaware cannot "eliminate the implied contractual covenant of good faith and fair dealing."  *Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93, 100 (Del. 2013).

43.    By virtue of their positions as directors of Buckeye GP, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Buckeye Partners to engage in the practices complained of herein.

44.     Each of the Individual Defendants is required to act in good faith, in the best interests of the Partnership's unitholders and with due care.  In a situation where the directors of a publicly traded company and/or master limited partnership undertake a transaction that may result in a change in corporate control, the directors must take all steps reasonably required to maximize the value unitholders will receive rather than use a change of control to benefit themselves, and to disclose all material information concerning the proposed change of control to enable the unitholders to make an informed voting decision.  To diligently comply with this duty, the directors of a corporation may not take any action that:

   a.   Adversely affects the value provided to the corporation's unitholders;

   b.   Contractually prohibits them from complying with or carrying out their fiduciary duties;

   c.   Discourages or inhibits alternative offers to purchase control of the corporation or its assets;

   d.   Will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's unitholders; or

   e.   Will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public unitholders.

45.     Moreover, Section 8.5 of the LPA provides that limited partners have the right "to obtain true and full information regarding the status of the business and financial condition of the Partnership" and "to obtain such other information regarding the affairs of the Partnership as is just and reasonable."

10

46.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Merger, violated duties owed to Plaintiff and the other unitholders of Buckeye Partners, including their express and implied duties under the LPA and their duties of loyalty, good faith, candor and independence under both the Partnership's LPA and under governing Delaware law, and have failed to provide Plaintiff and other Buckeye Partners unitholders with true, full, and fair disclosures concerning the Merger.

## VI.    SUBSTANTIVE ALLEGATIONS

### a.     Partnership Background and Its Poise for Growth

47.     Buckeye Partners is a publicly traded master limited partnership which owns and operates a diversified global network of integrated assets providing midstream logistic solutions, primarily consisting of the transportation, storage, processing and marketing of liquid petroleum products. and other third-party entities to enhance and exploit oil and gas properties.  It is a Delaware limited partnership.

48.     Buckeye Partners is one of the largest independent liquid petroleum products pipeline operators in the United States in terms of volumes delivered, with approximately 6,000 miles of pipeline.  Buckeye also uses its service expertise to operate and/or maintain third-party pipelines and perform certain engineering and construction services for its customers.  Buckeye's global terminal network comprises more than 115 liquid petroleum products terminals with aggregate tank capacity of over 118 million barrels across our portfolio of pipelines, inland terminals and marine terminals located primarily in the East Coast, Midwest and Gulf Coast regions of the United States as well as in the Caribbean.

49.     The Partnership's 2018 fiscal year was successful and positioned Buckeye Partners for near and long-term growth.

50.      In a February 8, 2019 press release announcing the Partnership's fourth quarter and full-year 2018 results, Defendant Smith stated, in part, "[w]e have reduced our leverage, strengthened our balance sheet, increased our distribution coverage ratio and significantly improved our overall financial flexibility as a result of our recently completed dispositions of the package of non-integrated domestic pipeline and terminal assets in December 2018 and our equity interest in VTTI in January 2019….  We believe these actions solidified our investment grade credit rating, eliminated the need for Buckeye to access the public equity markets and will allow us to reallocate capital to the higher return growth opportunities across our remaining assets, positioning us to provide solid returns for our unitholders over the long-term."

51.      Moreover, even after the announcement of the Proposed Transaction, Buckeye Partners, the Partnership's First Quarter 2019 results establish its near- and long-term business prospects.  In a May 10, 2019 press release on the results, "Our first quarter results demonstrated the stability of our diversified asset portfolio," stated Clark C. Smith, Chairman, President and Chief Executive Officer.  "Our Domestic Pipelines and Terminals segment benefited from higher average pipeline tariff rates, driven by annual escalations on our systems, and increased pipeline and terminal throughput volumes, after adjusting for the Domestic Asset Package sale.  Within our Global Marine Terminals segment, strong performance by our Buckeye Texas Partners facilities, which benefited from annual fee escalations and continued operating efficiencies during the quarter, was partially offset by the continued impact of challenging market conditions in the segregated storage market.  Our Buckeye Merchant Services segment continued to generate strong utilization across our portfolio of assets and again achieved a record contribution to our other segments, while favorable spreads more than offset weaker rack margins in this

business.  Finally, all of our businesses benefited from our operating and administrative teams'

continued focus on managing costs across the organization."

### b.    <u>**The Flawed Sales Process**</u>

52.    As detailed in the Preliminary Proxy, the process deployed by the Individual

Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual

Defendants, and was designed with only one concern in mind – to effectuate a sale of the

Partnership to IFM.

53.    First, it appears that only a cursory market check was conducted by Partnership or

its financial advisors during the sales process.  Notably, it appears that only two potentially

interested third parties were affirmatively contacted by the Buckeye Partners or its financial

advisors during the sales process.  Moreover, neither Buckeye Partners nor its financial advisors

appear to have reached out to the other entities of the initial interested consortium of which IFM

was a part after its dissolution to gauge the individual interest of the entities therein.

54.    In addition, the Preliminary Proxy indicates that no committee of independent

board members was created to run the sales process.

55.    The Preliminary Proxy is also unclear as to the nature of any specific standstill

restrictions arising out of the terms of any of the non-disclosure agreements entered into between

Buckeye Partners on the one hand and any interested third party, including IFM, on the other,

and if the terms of any included "don't-ask, don't-waive" provisions in any such agreements, and

if so, the specific conditions, if any, under which such provisions would fall away.

56.    Moreover, the Preliminary Proxy is also unclear as to any differences that may

exist between the various non-disclosure agreements entered into between Buckeye Partners and

any interested third parties.

57.     The Preliminary Proxy does not divulge why Buckeye Partners retained two separate financial advisors, at significant cost.  Specifically, the Preliminary Proxy does not disclose why it was necessary to retain Wells Fargo in addition to Intrepid (who was already retained) at a cost of $17.5 million.

58.     In addition, the Preliminary Proxy does not contain a fairness opinion from Intrepid regarding the Proposed Transaction.  Said opinion, if it exists, should be divulged to unitholders.  If no fairness opinion was created by Intrepid, it is further evidence as to the unnecessary waste of engaging two separate financial advisors by the Partnership.  The Preliminary Proxy also fails to indict what relationship, if any, Intrepid has with IFM or its affiliates.

59.     Finally, the Preliminary Proxy does not provide adequate information regarding the Board's decision, announced on November 2, 2018, to divest several key assets during the sales process, selling its 50% equity stake in the Vitol Tank Terminal International B.V. ("VTTI") and a package of non-integrated domestic pipeline and terminal assets for a collective $1.425 billion, as well as significantly reducing the Partnerships cash distribution from $3.00 per unit to $0.75 per unit on an annual basis.  This significant sale of assets and reorganization of cash distributions during the sales process likely had a significant impact on the availability of any potentially interested third parties, however the reasoning behind this decision, and its impacts on the Sales Process, are not disclosed in the Preliminary Proxy.

60.     It is not surprising, given this background to the overall sales process, that it was conducted in a completely inappropriate and misleading manner.

c.    **The Proposed Transaction**

61.    On May 10, 2019, Buckeye Partners and IFM issued a press release announcing

the Proposed Transaction.  The press release stated, in relevant part:

> HOUSTON and NEW YORK, May 10, 2019 (GLOBE NEWSWIRE) -- IFM Investors and Buckeye Partners, L.P. (NYSE: BPL) today announced a definitive agreement ("Agreement") under which the IFM Global Infrastructure Fund will acquire all of the outstanding public common units of Buckeye for $41.50 per common unit. The all-cash transaction is valued at $10.3 billion enterprise value and $6.5 billion equity value.  The acquisition price represents a 27.5% premium to Buckeye's closing unit price on May 9, 2019 and a 31.9% premium to Buckeye's volume-weighted average unit price since November 1, 2018, which is the last trading day prior to Buckeye's announcement of certain strategic actions. Buckeye's Board of Directors unanimously approved the proposed transaction with IFM. The closing of the merger will be subject to approval of a majority of the Buckeye unitholders, certain regulatory approvals and other customary closing conditions.
>
> Buckeye owns and operates one of the largest diversified networks of integrated midstream assets, including 6,000 miles of pipeline with over 100 delivery locations and 115 liquid petroleum products terminals with aggregate tank capacity of over 118 million barrels. Its network of marine terminals is located primarily in the East Coast and Gulf Coast regions of the United States, as well as in the Caribbean.
>
> IFM is a pioneer and leader in infrastructure investing on behalf of institutional investors globally, with a 23-year track record of success. IFM has $90 billion of assets under management, including $39.1 billion in infrastructure, which it manages on behalf of more than 370 institutional investors, and takes a long-term approach to investing, with no pre-determined time divestiture horizon. IFM targets core infrastructure in developed markets and currently has interests in 32 investments across North America, Australia and Europe, including several midstream assets.
>
> "This acquisition is aligned with IFM's focus on investing in high quality, essential infrastructure assets that underpin the economies in which they operate," said Julio Garcia, Head of Infrastructure, North America of IFM.
>
> "We are pleased to have the opportunity to bring the Buckeye business and management team under the IFM umbrella," said Jamie Cemm, Executive Director of IFM. "The proposed acquisition of Buckeye is a complementary addition to IFM's substantial investments in energy infrastructure across North America and globally. We look forward to supporting the continuing growth of the business."
>
> "Buckeye's Board of Directors recently reviewed strategic options for the business and determined that IFM's proposal to acquire Buckeye is in the best interest of Buckeye," said Clark C. Smith, Chairman, President and Chief Executive Officer of Buckeye. "The proposed transaction will provide immediate and enhanced value for our unitholders with an attractive premium that accelerates long-term returns and represents the underlying value of our business. In addition, the proposed transaction will provide Buckeye with superior access to capital to execute on its long-term business strategy. We look forward to this next chapter in Buckeye's 133-year story."
>
> Additional Information

Closing of the transaction is expected to occur in the fourth quarter of 2019 and is subject to customary closing conditions. Pending transaction close, the companies will continue to operate independently.

Evercore Group LLC is acting as lead financial advisor to IFM, and Credit Suisse, Goldman, Sachs & Co. LLC and BofA Merrill Lynch are acting as financial advisors to IFM. White & Case LLP and Baker Botts LLP are acting as legal advisors to IFM. Intrepid Partners, LLC and Wells Fargo Securities, LLC are acting as financial advisors and Cravath, Swaine & Moore LLP is acting as legal advisor to Buckeye.

### d.    **The Unfair Price**

62.    Given the Partnership's recent strong performance and its positioning for growth, the Merger consideration is inadequate and significantly undervalues the Partnership.

63.    The Merger provides a meager premium. Notably, within the last 52 weeks, the Partnership has traded as high as $38.65 per share, a value only 7% below the Merger consideration.

64.    In addition, the Merger consideration fails to adequately compensate Buckeye Partners unitholders for the significant synergies created by the Merger. In the press release announcing the Merger, Jamie Cemm, Executive Director of IFM, stated:

We are pleased to have the opportunity to bring the Buckeye business and management team under the IFM umbrella," said Jamie Cemm, Executive Director of IFM. "The proposed acquisition of Buckeye is a complementary addition to IFM's substantial investments in energy infrastructure across North America and globally. We look forward to supporting the continuing growth of the business.

65.    The low value of the transaction was not lost on the financial media. In a Seeking Alpha article, the author stated, "[l]ast year, DCF for Buckeye came out to $631.63 million, and the implied purchase price of the transaction is $6.5 billion on an equity basis. This results in a trading multiple on free cash flow of 10.3. No matter how you stack it, that looks quite cheap. Another way to value the firm, though, is using its EV/EBITDA. With EBITDA of $1.01 billion in 2018, the purchase price of $10.3 billion translates to a multiple of 10.2. This is a more realistic reading and is reflective of Buckeye's leverage, but even that seems to be at the low end

of valuation for a quality operator with a history of robust cash flows and the ability to keep current operations in check."

66.     The author concluded, "something about this deal looks off.  While the company is not too far from fair value, I still believe upside from here would have been warranted, with an EV/EBITDA of 12 or higher not necessarily being out of the question."

        **e.**      **The Preclusive Deal Protection Devices**

67.     To the detriment of Buckeye Partners unitholders, as part of the Merger Agreement, the Individual Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Merger a *fait accompli* and ensure that no competing offers will emerge for the Partnership.

68.     The Merger Agreement contains a strict "no shop" provision prohibiting the members of the Buckeye GP Board from taking any affirmative action to comply with their fiduciary duties to maximize unitholder value, including soliciting alternative acquisition proposals or business combinations.

69.     That same section provides a matching rights provision whereby the Partnership must promptly notify IFM of the bidder's identity and the terms of the bidder's offer should it receive an unsolicited competing acquisition proposal.  The Partnership must further require the Board to keep IFM informed of all material developments with respect to the status and terms of any such proposal and to provide it with copies of any additional written proposals received by the Partnership or that the Partnership has delivered to any third party.

70.     Upon receipt of a "Superior Proposal," Buckeye Partners must then permit IFM to negotiate to make such adjustments in the terms and conditions of the Merger Agreement so that such superior proposal ceases to constitute a superior proposal.

71.     The effect of these provisions is to prevent the Board from entering discussions or negotiations with other potential purchasers unless the Board can first determine that the competing acquisition proposal is, in fact, "superior," and even then, the Buckeye Partners must permit IFM to match the competing acquisition proposal.  Consequently, this provision prevents Buckeye GP's Board from exercising their fiduciary duties and precludes an opportunity for a potential purchaser to emerge.

72.     Furthermore, the Merger Agreement provides that Buckeye Partners must pay IFM a termination fee of $130 million if the Partnership decides to pursue another competing offer, thereby essentially requiring that the alternative bidder agree to pay a naked premium for the right to provide Buckeye Partners unitholders with a superior offer.

73.     Ultimately, these preclusive deal protection devices illegally restrain the Partnership's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Partnership.  The circumstances under which the Board may respond to an unsolicited alternative acquisition proposal that constitutes, or would reasonably be expected to constitute, a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.  Likewise, these provisions will foreclose the new bidder from providing the needed market check of IFM's inadequate offer.

**f.       The Partnership's Directors and Officers Are Receiving Unique Benefits**

74.     Buckeye GP's directors and officers will receive unique benefits in connection with the Merger.  The breakdown of the benefits of the deal indicate that Buckeye Partnership and Buckeye GP insiders are the primary beneficiaries of the Proposed Transaction, not the Partnership's public unitholders.   The Board and the Partnership's executive officers are

conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public unitholders of Buckeye Partners.

75.     Certain insiders stand to receive massive financial benefits as a result of the Proposed Transaction.   Notably, Partnership insiders, including the Individual Defendants, currently own large, illiquid portions of Partnership units that will be exchanged for large cash pay days upon the consummation of the Proposed Transaction.   Partnership insiders own such units as follows:

| Name [1] | Number of Partnership Units [2] | Percentage of Partnership Units |
|---|---|---|
| Clark C. Smith | 214,586 [3] | * |
| Pieter Bakker | 21,552 | * |
| Barbara M. Baumann | 8,667 | * |
| Barbara J. Duganier | 13,000 | * |
| Joseph A. LaSala, Jr. | 23,000 | * |
| Mark C. McKinley | 28,000 | * |
| Larry C. Payne | 10,667 | * |
| Oliver "Rick" G. Richard, III | 23,408 | * |
| Frank S. Sowinski | 32,210 | * |
| Martin A. White | 25,242 | * |
| Keith E. St.Clair | 139,715 [4] | * |
| Robert A. Malecky | 108,764 [5] | * |
| Khalid A. Muslih | 63,978 | * |
| William J. Hollis | 29,570 | * |
| All directors and officers as a group (18 persons) | 832,934 | * |
| OppenheimerFunds, Inc. | 14,927,413 [6] | 9.7% |
| ALPS Advisors, Inc. | 14,532,364 [7] | 9.4% |
| Tortoise Capital Advisors, L.L.C. | 11,271,876 [8] | 7.3% |

76.     Notably the Preliminary Proxy does not provide a breakdown of the amount of money each block of units represents under the Proposed Transaction, further obscuring the conflicts of interests from Plaintiff and other public unitholders of the Partnership.

77.     Furthermore, upon the consummation of the Proposed Transaction, each outstanding Partnership option or equity award will be canceled and converted into the right to receive certain consideration according to the Merger Agreement.   The Individual Defendants

and other Partnership insiders will receive consideration as a consequence of these options, not shared amongst Plaintiff and other members of the Class, as follows:

| Name | Partnership Phantom Units | | Partnership Deferral Units/Partnership Director Deferred Units | | Partnership Performance Units[1] | | Distribution Equivalents with respect to Partnership Phantom Units and Partnership Performance Units[2] | Total ($) [3] |
|---|---|---|---|---|---|---|---|---|
| | # | ($) | # | ($) | # | ($) | ($) | ($) |
| **Executive Officers** | | | | | | | | |
| Clark Smith | 104,862 | $4,351,773 | 68,178 | $2,829,387 | 209,725 | $8,703,588 | $ 1,054,618 | $16,939,366 |
| Keith E. St.Clair | 29,996 | $1,244,834 | 36,690 | $1,522,635 | 59,988 | $2,489,502 | $ 308,286 | $ 5,565,257 |
| Robert Malecky | 24,157 | $1,002,516 | 36,638 | $1,520,477 | 48,312 | $2,004,948 | $ 235,269 | $ 4,763,210 |
| Khalid Muslih | 25,265 | $1,048,498 | 34,968 | $1,451,172 | 50,531 | $2,097,037 | $ 253,408 | $ 4,850,114 |
| William Hollis | 19,202 | $ 796,883 | 29,288 | $1,215,452 | 38,401 | $1,593,642 | $ 190,801 | $ 3,796,778 |
| Mark Esselman | 12,994 | $ 539,251 | 17,042 | $ 707,243 | 25,987 | $1,078,461 | $ 138,142 | $ 2,463,097 |
| Todd Russo | 18,423 | $ 764,555 | 20,654 | $ 857,141 | 36,844 | $1,529,026 | $ 188,465 | $ 3,339,187 |
| Joseph Sauger | 14,832 | $ 615,528 | 11,662 | $ 483,973 | 29,664 | $1,231,056 | $ 155,501 | $ 2,486,058 |
| Gary Bohnsack | 28,711 | $1,191,507 | 10,260 | $ 425,790 | 13,827 | $ 573,821 | $ 66,224 | $ 2,257,341 |
| **Directors** | | | | | | | | |
| Pieter Bakker | 3,583 | $ 148,695 | — | — | — | — | — | $ 148,695 |
| Barbara M. Baumann | 3,583 | $ 148,695 | — | — | — | — | — | $ 148,695 |
| Barbara J. Duganier | 3,583 | $ 148,695 | — | — | — | — | — | $ 148,695 |
| Joseph A. LaSala, Jr. | 3,583 | $ 148,695 | — | — | — | — | — | $ 148,695 |
| Mark C. McKinley | 3,583 | $ 148,695 | 598 | $ 24,817 | — | — | — | $ 173,512 |
| Larry C. Payne | 3,583 | $ 148,695 | — | — | — | — | — | $ 148,695 |
| Oliver "Rick" G. Richard, III | 3,583 | $ 148,695 | — | — | — | — | — | $ 148,695 |
| Frank S. Sowinski | 3,583 | $ 148,695 | — | — | — | — | — | $ 148,695 |
| Martin A. White | 3,583 | $ 148,695 | — | — | — | — | — | $ 148,695 |

78.    Moreover, certain employment agreements with certain Partnership executives entitle such executives to severance packages should their employment be terminated under certain circumstances.  These 'golden parachute' packages are significant and will grant each director or officer entitled to them millions of dollars, compensation not shared by Buckeye Partners common unitholders.

79.    These golden parachute payouts will be paid to Partnership insiders as a consequence of the Proposed Transaction's consummation, as follows:

| Name | Cash Severance ($) [1] | Equity ($) [2] | Benefits ($) [3] | Total ($) |
|---|---|---|---|---|
| Clark Smith | $ 2,021,895 | $ 16,939,366 | $ 27,126 | $ 18,988,386 |
| Keith E. St.Clair | $ 1,193,400 | $ 5,565,257 | $ 26,286 | $ 6,784,943 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Robert Malecky | $ | 1,071,000 | $ | 4,763,210 | $ | 27,034 | $ | 5,861,243 |
| Khalid Muslih | $ | 1,071,000 | $ | 4,850,114 | $ | 27,187 | $ | 5,948,301 |
| William Hollis | $ | 907,800 | $ | 3,796,778 | $ | 17,673 | $ | 4,772,251 |

80.     Thus, while the Merger is not in the best interest of Buckeye Partners unitholders, it will produce lucrative benefits for the Partnership's officers and directors.

### g.    The Materially Misleading and/or Incomplete Preliminary Proxy

81.     On June 7, 2019, Defendants caused to be filed with the SEC a materially misleading and incomplete Preliminary Proxy that, in violation of their fiduciary duties, failed to provide the Partnership's unitholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Partnership's unitholders concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process Leading Up to the Proposed Transaction*

82.     Specifically, the Preliminary Proxy fails to provide material information concerning the process conducted by the Partnership and the events leading up to the Proposed Transaction.  In particular, the Preliminary Proxy fails to disclose:

a.    The nature of any specific standstill restrictions arising out of the terms of any of the non-disclosure agreements entered into between Buckeye Partners on the one hand and any interested third party, including Marvell, on the other, and if the terms of any included "don't-ask, don't-waive" provisions in any such agreements, and if so, the specific conditions, if any, under which such provisions would fall away;

b. The nature of any differences that exist between the various non-disclosure agreements entered into between Buckeye Partners and any interested third parties;

c. The specific reasoning as to why the market check conducted by the Partnership's financial advisors during the sales process entailed only contacting two potentially interested third parties;

d. Why no committee of independent board members was created to run the sales process;

e. The specific reasoning as to why Buckeye Partners retained two separate financial advisors;

f. Why Intrepid did not provide a fairness opinion regarding the Proposed Transaction;

g. The amount of money being paid to Intrepid by Buckeye Partners for its services as a financial advisor regarding the Proposed Transaction;

h. The specific nature of any work performed by Intrepid for IFM or any IFM affiliate within the last two years;

i. The Preliminary Proxy does not provide adequate information regarding the Board's decision, announced on November 2, 2018, to divest several key assets during the sales process, selling its 50% equity stake in VTTI and a package of non-integrated domestic pipeline and terminal assets for a collective $1.425 billion, as well as significantly reducing the Partnerships cash distribution from $3.00 per unit to $0.75 per unit on an annual basis. This significant sale of assets and reorganization of cash distributions during

the sales process likely had a significant impact on the availability of any potentially interested third parties, however the reasoning behind this decision, and its impacts on the Sales Process, should be disclosed.

*Omissions and/or Material Misrepresentations Concerning Buckeye Partners' Financial Projections*

83.     The Preliminary Proxy fails to provide material information concerning financial projections provided by Buckeye Partners' management and relied upon by Intrepid and Wells Fargo in their analyses.   The Preliminary Proxy discloses management-prepared financial projections for the Partnership which are materially misleading.  The Preliminary Proxy indicates that in connection with the rendering of Wells Fargo's fairness opinion, Wells Fargo reviewed "certain internal financial analyses and forecasts for the Partnership (the "Partnership Projections") prepared by the management of the Partnership."   Accordingly, the Preliminary Proxy should have, but fails to provide, certain information in the projections that Buckeye Partners management provided to the Board, Intrepid and Wells Fargo.  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig*., 924 A.2d 171, 201-203 (Del. Ch. 2007).

84.     With respect to the "2018 Management Case" projections, the Preliminary Proxy fails to provide material information concerning the financial projections prepared by Partnership management.  Specifically, the Preliminary Proxy fails to disclose the material line items for Adjusted EBITDA.

85.     With respect to the "Updated 2018 Management Case" projections, the Preliminary Proxy fails to provide material information concerning the financial projections

prepared by Partnership management.  Specifically, the Preliminary Proxy fails to disclose the material line items for Adjusted EBITDA.

86.    With respect to the "2019 Management Case" projections, the Preliminary Proxy fails to provide material information concerning the financial projections prepared by Partnership management.  Specifically, the Preliminary Proxy fails to disclose the material line items for Adjusted EBITDA.

87.    Specifically, the Preliminary Proxy provides non-GAAP financial metrics, including Adjusted EBITDA, for each set of disclosed projections but fails to disclose a reconciliation of all non-GAAP to GAAP metrics.

88.    This information is necessary to provide Partnership unitholders a complete and accurate picture of the sales process and its fairness.  Without this information, unitholders were not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

89.    Without accurate projection data presented in the Preliminary Proxy, Plaintiff and other unitholders of Buckeye Partners are unable to properly evaluate the Partnership's true worth, the accuracy of Intrepid and/or Wells Fargo's financial analyses, or make an informed decision whether to vote their Partnership units in favor of the Proposed Transaction.  As such, the Board has breached their fiduciary duties by failing to include such information in the Preliminary Proxy.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Wells Fargo*

90.    In the Preliminary Proxy, Wells Fargo describes its respective fairness opinion and the various valuation analyses performed to render such opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis

for, underlying assumptions. Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

91.     With respect to the *Discounted Cash Flow Analysis*, the Preliminary Proxy fails to disclose the following:

      a.   The specific inputs and assumptions used to calculate the discount rate range of 7.84% to 8.34%;

      b.   The specific inputs and assumptions used to calculate Buckeye Partners' perpetuity growth rates of 1.00% to 2.00%.

92.     With respect to the *Discounted Distributions Analysis*, the Preliminary Proxy fails to disclose the following:

      a.   The specific inputs and assumptions used to calculate the cost of equity range of 9.80% to 10.30%;

      b.   The specific inputs and assumptions used to calculate Buckeye Partners' perpetuity growth rates of 0.00% to 2.00%.

93.     With respect to the *Selected Precedent Transactions Analysis*, the Preliminary Proxy fails to disclose the following:

      a.   Why only three precedent transactions were chosen to compare;

      b.   The total value of each transaction;

      c.   The date each precedent transaction closed;

94.     With respect to the *Selected Public MLPs Analysis*, the Preliminary Proxy fails to disclose the following:

      a.   Why only four MLPs were chosen to compare.

95.     The Preliminary Proxy fails to disclose why Buckeye Partners retained multiple financial advisors.

96.     Finally the Preliminary Proxy fails to disclose any financial analysis, or any fairness opinion whatsoever, from Intrepid, even though the Preliminary Proxy indicates that Intrepid was retained by the Partnership to act as a financial advisor regarding the Proposed Transaction.

97.     These disclosures are critical for unitholders to be able to make an informed decision on whether to vote their units in favor of the Proposed Transaction.

98.     Without the omitted information identified above, Buckeye Partners' public unitholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes unitholder value and serves their interests.  Moreover, without the key financial information and related disclosures, Buckeye Partners' public unitholders cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in their best interests.  As such, the Board has breached their fiduciary duties by failing to include such information in the Preliminary Proxy.

## VII.    CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff and the Class Against the Individual Defendants
for Breach of Fiduciary Duties**

99.     Plaintiff repeats all previous allegations as if set forth in full herein.

100.    The Individual Defendants have knowingly and recklessly and in bad faith violated fiduciary duties of care and loyalty owed to the unitholders of Buckeye Partners and have acted to put their personal interests ahead of the interests of Buckeye Partners unitholders. The Individual Defendants' registration of the Merger will result in change of control of the

Partnership which imposes heightened fiduciary responsibilities to maximize Buckeye Partners' value for the benefit of the unitholders and requires enhanced scrutiny by the Court.

101.   The Individual Defendants have breached their fiduciary duties of loyalty, good faith, and independence owed to the unitholders of Buckeye Partners because, among other reasons:

      a.   they failed to take steps to maximize the value of Buckeye Partners to its public unitholders and took steps to avoid competitive bidding;

      b.   they failed to properly value Buckeye Partners;

      c.   they failed to take the necessary steps to comply with their fiduciary duties and Buckeye Partners' LPA; and

      d.   they ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Merger.

102.   As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Buckeye Partners' assets and will be prevented from benefiting from a value-maximizing transaction.

103.   Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Merger, to the irreparable harm of the Class.

104.   Plaintiff and the Class have no adequate remedy at law.

### COUNT II

**On Behalf of Plaintiff and the Class Against the Individual Defendants
for Breach of Fiduciary Duty – Disclosure**

105.    Plaintiff repeats all previous allegations as if set forth in full herein.

106.    The fiduciary duties of the Individual Defendants in the circumstances of the Merger require them to disclose in a non-misleading way to Plaintiff and the Class all information material to the decisions confronting Buckeye Partners unitholders.

107.    As set forth above, the Individual Defendants have breached their fiduciary duty through materially misleading disclosures and material disclosure omissions.

108.    As a result, Plaintiff and the Class members are being harmed irreparably.

109.    Plaintiff and the Class have no adequate remedy at law.

<u>**COUNT III**</u>

**On Behalf of Plaintiff and the Class Against the Individual Defendants and Buckeye GP <u>for Breach of Express and Implied Duties in Connection with the Merger</u>**

110.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

111.    Buckeye GP and the Individual Defendants owed the Partnership and its public unitholders duties as defined in the LPA.  Further, Buckeye Partners, Buckeye GP and the Individual Defendants owed the public unitholders the implied duty of good faith and fair dealing, which the LPA could not eliminate.

112.    Buckeye Partners, Buckeye GP and the Individual Defendants breached their express obligations under the LPA and the implied duty of good faith and fair dealing by, for example, causing Buckeye Partners to enter into the Merger Agreement and pursue the Merger, and by failing to disclose material information to allow Buckeye Partners unitholders to cast a fully informed vote on the Merger .

113.    By reason of the foregoing, Buckeye GP and the Individual Defendants approved the Proposed Transaction in bad faith.

114.    Plaintiff and the other members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

**COUNT IV**

**On Behalf of Plaintiff and the Class Against the Individual Defendants and Buckeye Partners for Aiding and Abetting Buckeye GP's Breach of Express and Implied Duties in Connection with the Proposed Transaction**

115.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

116.    As set forth above, Buckeye GP owed Buckeye Partners' public unitholders duties and obligations that Buckeye GP breached in respect to the Merger.

117.    Further, each Defendant knowingly participated in the foregoing breaches by directly or indirectly causing Buckeye GP to pursue the Merger and enter into the Merger Agreement, thereby causing damage to Plaintiff and the Class.

118.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

**COUNT V**

**On Behalf of Plaintiff and the Class Against all Defendants, for Violations of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder**

119.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

120.    During the relevant period, Defendants disseminated the false and misleading Preliminary Proxy specified above, which failed to disclose material facts necessary in order to

make the statements made, in light of the circumstances under which they were made, not misleading.

121.    The Preliminary Proxy was prepared, reviewed and/or disseminated by Defendants.  It misrepresented and/or omitted material facts, including material information about the unfair sales process for the Partnership, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Partnership's assets.

122.    In so doing, Defendants made untrue statements of material facts and omitted material facts necessary to make the statements that were made not misleading in violation of § 14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  By virtue of their positions within the Partnership, the Individual Defendants and Buckeye GP were aware of this information and of their duty to disclose this information in the Registration Statement.

123.    The Individual Defendants and Buckeye GP were at least negligent in filing the Preliminary Proxy with these materially false and misleading statements.

124.    The omissions and false and misleading statements in the Preliminary Proxy are material in that a reasonable unitholder would consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Preliminary Proxy and in other information reasonably available to unitholders.

125.    By reason of the foregoing, Defendants have violated § 14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.

126.    Because of the false and misleading statements in the Registration Statement, Plaintiff is threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure that Defendants' misconduct is corrected.

## COUNT VI

**On Behalf of Plaintiff and the Class Against the Individual Defendants and Buckeye GP
for Violations of Section 20(a) of the Exchange Act**

127.    Plaintiff repeats all previous allegations as if set forth in full herein.

128.    The Individual Defendants and Buckeye GP acted as controlling persons of
Buckeye Partners within the meaning of § 20(a) of the 1934 Act as alleged herein.  By virtue of
their positions as officers and/or directors of Buckeye Partners and participation in and/or
awareness of the Partnership's operations and/or intimate knowledge of the false statements
contained in the Preliminary Proxy filed with the SEC, they had the power to influence and
control and did influence and control, directly or indirectly, the decision-making of the
Partnership, including the content and dissemination of the various statements which Plaintiff
contends are false and misleading.

129.    Each Individual Defendant and Buckeye GP were provided with or had unlimited
access to copies of the Preliminary Proxy and other statements alleged by Plaintiff to be
misleading prior to and/or shortly after these statements were issued and had the ability to
prevent the issuance of the statements or cause the statements to be corrected.

130.    In particular, each Individual Defendant and Buckeye GP had direct and
supervisory involvement in the day-to-day operations of the Partnership and, therefore, are
presumed to have had the power to control or influence the particular transactions giving rise to
the securities violations as alleged herein, and exercised the same.  The Preliminary Proxy at
issue contains the unanimous recommendation of each of the Individual Defendants to approve
the Proposed Transaction.  They were thus directly involved in the making of this document.

131.    In addition, as the Preliminary Proxy sets forth at length, and as described herein,
the Individual Defendants and Buckeye GP were each involved in negotiating, reviewing and

approving the Proposed Transaction.  The Preliminary Proxy purports to describe the various issues and information that they reviewed and considered, descriptions which had input from the Individual Defendants and Buckeye GP.

132.    By virtue of the foregoing, the Individual Defendants and Buckeye GP have violated § 20(a) of the 1934 Act.

133.    As set forth above, the Individual Defendants and Buckeye GP had the ability to exercise control over and did control a person or persons who have each violated § 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, Defendants are liable pursuant to § 20(a) of the 1934 Act.  As a direct and proximate result of Defendants' conduct, Partnership unitholders will be irreparably harmed.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

      a.   declaring this action to be a class action and certifying Plaintiff as Class representative and his counsel as Class counsel;

      b.   enjoining, preliminarily and permanently, the Merger

      c.   directing Defendants to fairly and fully disclose all material information concerning the Merger;

      d.   in the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

      e.   directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

f.  awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

g.  granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  June 13, 2019.

Respectfully submitted,

_____*/s/ Thomas E. Bilek*_____
Thomas E. Bilek
TX Bar No. 02313525 / SDTX Bar No. 9338
**THE BILEK LAW FIRM, L.L.P.**
700 Louisiana, Suite 3950
Houston, TX  77002
(713) 227-7720

*Attorneys for Plaintiff*

**OF COUNSEL:**

Evan Smith
Marc L. Ackerman
**BRODSKY & SMITH, LLC**
Two Bala Plaza, Suite 510
Bala Cynwyd, PA  19004
Tel (610) 667-6200
Fax (610) 667-9029